## Chicago Junction Ry. Co. v. Annie McGrath et al.

1. STREETS—*Rights of Party Passing Around Cars Partly Blockading a Highway.*—A private individual is not by law compelled to stop and wait at a railroad crossing until the railroad company has removed cars which partly blockade it. He has a right to pass around the end of the cars, and in so doing he does not become a trespasser, nor put himself outside the protection of the law, if he steps over the line of the street onto the railroad yards.

2. NEGLIGENCE—*Stepping Directly in Front of Detached Cars.*—Stepping on the track directly in front of cars which are stationary and detached, is not negligence unless the party doing so knows or ought to know that they are about to be moved by some extraneous force.

3. DUE CARE—*Where a Question for the Jury.*—Where there is no evidence that the deceased party acted in any way other than an ordinarily prudent man would have acted under like circumstances, it is not reversible error for the court to submit to the jury whether or not at the time he was killed he was in the exercise of due care for his personal safety.

4. NEW TRIALS—*Lie Within the Legal Discretion of the Trial Judge.*

Chicago Junction Ry. Co. v. McGrath.

—The granting or the refusing of a new trial is in the legal discretion of the trial judge, and when he has exercised that discretion, a court of review can not interfere with his action, unless, from the facts and circumstances appearing in evidence, they are of the opinion that he was clearly wrong.

5. SAME—*For Interference with the Jury.*—It is not every interference with the jury that will warrant a new trial. Each case must stand upon its own facts and be decided by the trial court in the exercise of his legal discretion.

Trespass on the Case.—Death from negligent act.   Appeal from the Superior Court of Cook County; the Hon. THEODORE BRENTANO, Judge presiding. Heard in this court at the March term, 1902. Affirmed. Opinion filed February 26, 1903.

This action was brought against appellant to recover damages for negligently causing the death of William McGrath, who, at the time, was employed by the Weaver Coal Company as a teamster. The yards of this company extend along the south line of Fortieth street, in the city of Chicago, a distance of two blocks, from Wentworth avenue on the east to Hopkins street on the west. Through the center of this yard a public highway, known as Atlantic street, runs north and south. In the yard are many railway tracks, lying substantially east and west, on which appellant was accustomed to place loaded coal cars, and from which it removed the same when they were unloaded. The main barn of the yard stands west of Atlantic street. On the day of his death McGrath was directed to place his wagon beside a loaded car that stood on track No. 3 on the east side of Atlantic street in a northeasterly direction from the barn. He did so. It was then the noon hour. The deceased, intending to feed his three horse team where it stood, started to the barn for oats. As he crossed Atlantic street a switchman in the employ of appellant told him that they were going to do some switching and to look out for himself. There were then no cars on the street. Deceased went into the barn, and in a short time came out carrying the oats in three nose-bags. When he reached the street three detached loaded cars covered the entire street crossing. The switchman, who stood on the other

side of the cars, was hidden from the view of McGrath. Deceased did not stop when he came to the obstruction, but walked along the south side of the cars until he came to the east end of the three, when he turned north across the track close to the end of the east car. At that instant two loaded cars, which had been "kicked" by an engine, then two or three hundred feet to the west, crashed into the three standing cars, pushing them from twenty to twenty-five feet, knocking McGrath down and running over him, thus inflicting the injuries which caused his death.

. On the trial of the case in the court below a verdict was rendered in favor of appellees and against appellant for the sum of $5,000, upon which the court entered judgment, after overruling the motion for a new trial made by appellant. To reverse this judgment appellant appeals to this court, and among the various errors assigned argues that the case should be reversed upon the following grounds:

First. That the record does not disclose any liability against the appellant.

Second. That the deceased, McGrath, was himself guilty of contributory negligence.

Third. That the court erred in its ruling upon the admission of a certain piece of evidence.

Fourth. That the verdict and judgment is vitiated by reason of certain conduct of a witness in appealing to the jury as they sat in the box, while the trial judge and the counsel were absent from the court room, to return a verdict in favor of the plaintiffs.

WINSTON, BABCOCK, STRAWN & SHAW, attorneys for appellant.

FRANCIS T. MURPHY, attorney for appellees; EDWARD C. HIGGINS, of counsel.

MR. PRESIDING JUSTICE BALL delivered the opinion of the court.

On the day William McGrath was killed appellant was engaged in setting loaded coal cars upon a track in the yard

of the Weaver Coal Company. It placed three loaded cars on that track in such position that they stood across Atlantic street, completely blocking the passage. The train was then moved to the west, and an empty car was set out on another track. Then, by a flying switch, two loaded coal cars were sent east along the track on which the other three cars stood. No one was in charge of or on these moving cars. They were wholly beyond the control of appellant, and would continue to run until stopped by natural forces, or by coming in contact with some obstacle. They ran against the three standing cars with such force that the latter were driven eastward from twenty to twenty-five feet. Just before the first cars were set in, the deceased, who was a teamster in the employ of the coal company and rightfully in the coal yard, went to the barn, situate just west of Atlantic street and to the south of this track, to get feed for his horses. They stood hitched to a wagon to the east of Atlantic street and to the north of this track. When the deceased came out of the barn he saw these three detached cars standing across Atlantic street. He had to cross this track to reach his horses. Instead of waiting for the removal of these cars, he walked along the south side of them until he came to the east end of the east car, when he stepped upon the track, intending to cross it in order to reach the spot where his team stood. In so doing he passed close to the end of the car. As he did this, the moving cars struck the standing cars, shoving them suddenly eastward over and upon him, causing his death. The deceased had worked in the coal yard for about one year before he was killed. During that time appellant had set cars in this yard almost daily in a manner similar to that it employed at the time of the accident. Hence the deceased knew, or must be held to have known, this custom. There is evidence tending to show that as he went to the barn he was told by the switchman they were going to set in some cars, and to look out for himself. The same switchman, at the time the deceased came out of the barn, was on the north side of the standing cars, a little to the west of

the street crossing, and therefore not visible to McGrath. There was no one on the south side of these cars except the deceased.

These are the main facts of the case upon which appellant predicates two propositions: first, that it did all that a reasonably prudent person would do under similar circumstances to prevent the possibility of accident; and, second, that the deceased was guilty of contributory negligence.

First. The mode in which these last cars were placed upon the track in question, while it is convenient, and speedy, can not be otherwise than dangerous when performed in a populous city or at any other place where many people are passing. The progress of cars thus "kicked," after the engine leaves them, is almost noiseless. The ringing of a bell 250 or 300 feet away does not tell the passer-by that a car of many tons weight is rapidly and silently stealing upon him. Had there been a brakeman upon these moving cars, he might have controlled them by the use of the brake, or he might have called out a warning when he saw the deceased walking alongside of the stationary cars, with the evident intent of passing to the north around them. The evidence tends to show that appellant had no one to guard this crossing. It is true that a brakeman was on the north side of these standing cars, but it seems that he was at the west of the street, intent upon coupling the cars when they came together. It does not require one to be a railway expert to know that when a brakeman is about to couple rapidly approaching cars to other cars that are stationary, he has all he can do to look out for his own safety. Until that duty is done he can not be expected to care for any one else. Again, this brakeman was not visible to McGrath, nor was he in a position so that he could or did warn deceased of the approaching danger; so that the situation, so far as McGrath was concerned, was the same as though there was no switchman near this crossing. It is said that this accident occurred within the yard. It is true that the deceased was killed a few feet outside of the line of

Chicago Junction Ry. Co. v. McGrath.

Atlantic street, but appellant, by blocking the street, had compelled him to either go around the end of the standing cars or to await the pleasure of appellant in removing the cars from the highway. The deceased had the same right in the public highway as had appellant. He was not by law compelled to wait. He had a right to pass around the end of the cars, and in so doing he did not become a trespasser, nor put himself outside the protection of the law; nor did he thereby relieve appellant of the duty of exercising toward him the same care it owed him had he attempted to cross the track within the limits of the street. Illinois Central R. R. Co. v. Baches, 55 Ill. 383-4-5; Chicago, B. & Q. R. R. Co. v. Murowski, 179 Ill. 77; Chicago, R. I. & P. Ry. Co. v. Dignan, 56 Ill. 487.

The question here is, not what is sufficient evidence to establish negligence upon the part of appellant, but is, did the proof tend to show its negligence? When it appears that appellant left this crossing practically unguarded, and then "kicked" two loaded cars along the track to this crossing, without a brakeman upon them to control them or to give warning of their approach, we can not say that such evidence does not tend to prove negligence; and therefore, in this regard, it is not for us to say, as a question of law, that this evidence, with all its natural inferences, does not support the verdict.

Second. Was the deceased guilty of such contributory negligence at the time of the accident as will prevent a recovery ?

He was engaged in his daily work. It was as much his duty to care for and to feed his team as it was to drive them or to shovel coal into or out of his wagon. The place where he left his team was designated by his foreman. He had to cross Atlantic street to get the feed for his horses, and he had to recross the same street with that feed to reach his horses. When he found the street blocked by cars he was not bound to wait for their removal. Using due care, he might go around the end of them. When he saw that the cars were stationary and detached, he knew that

they would not move until some outside force was applied to them. Hence, unless he knew, or ought to have known, that they were about to be moved by some extraneous force, it was not negligence for him to step on the track directly in front of them. McWilliams v. Detroit C M. Co., 31 Mich. 274; McGinnis v. R. R. Co., 52 N. Y. 215. When one goes behind a wagon from which the horses are detached, reasonable care does not require him to pass five or ten feet beyond it before he turns, nor to watch the wagon for fear it will back against him. So here, these detached motionless cars, in themselves, were as harmless as the wagon. They neither required avoidance nor scrutiny. It is no defense to an action of this kind that the deceased, by his own act, contributed to his death; it must appear that by his own fault he contributed to that result. Robinson v. Western Pacific R. R. Co., 48 Cal. 409. It follows the fact that the deceased, when he reached the east end of these three cars, turned at once to cross the track, was not negligence in law; nor can the fact, if it be a fact, a point upon which the record is silent, that he did not look at these cars as he started to go by them, be held to be more than a circumstance for consideration with all the other evidence in determining the question as to whether or not he was then in the exercise of due care for his personal safety. The deceased had the right to go anywhere in the coal yard his duty called him. It is true that where his wagon stood the space between the tracks was planked, while at the point where he was killed there was no planking. The planking was laid down in order that teams might be able to move in the yards the same weight of coal they were expected to draw upon the paved streets; and not for the benefit of a footman in the yards. The presence of planking gave no right to the pedestrian he did not have in those parts of the yard where it was absent. Hence this fact was immaterial. It is said that when he went to the barn he was told appellant was about to do switching and to look out for himself. When he came out to the barn he saw these three cars standing where they had not

been a few minutes before.   It therefore was not unreasonable for him to conclude that the promised switching had been done, and that he need not guard himself further from possible injury from that cause.   A careful consideration of this record has failed to convince us that the deceased acted in any way other than an ordinarily prudent man would have acted under like circumstances. Hence it was not reversible error for the learned trial judge to submit to the jury whether or not at the time he was killed he was in the exercise of due care for his personal safety, and whether or not the death of McGrath resulted from the negligence of appellant.   Lake Shore & M. S. Ry. Co. v. Johnsen, 135 Ill. 641, and cases cited.

A third proposition of appellant is:   Appellees, after they had shown the number of men then employed in the coal yard, were permitted to show, over the objection of appellant, that it was customary for these employes to pass to and fro over these yard tracks during the day.   This evidence was competent, as showing the conditions that existed in the coal yard at the time of the accident.   It also bears upon the degree of care to be used by appellant in its work in this yard.   It is obvious that it should be more careful in the handling of its cars in a locality where many employes were passing and repassing than is necessary or is required in a solitary place.   This evidence did not tend to establish a private crossing at the point where the deceased came to his death.

The fourth and last proposition of appellant is:   It contends that it was error for the trial judge to retire from the court room with counsel for both parties, without leaving the jury in charge of an officer of the court; and that the interference with the jury at this time by one of the plaintiff's witnesses was sufficient ground for a new trial, and the court below erred in not granting it.

It is the law, and it is common justice, that a case should go to the jury free from the contamination of any improper influences.   At the close of the case for the plaintiff, the attorney for the defendant (here appellant) handed the

court a written instruction, asking the court to instruct the jury to find the defendant not guilty, and requested the court to send the jury from the court room, as he desired to be heard upon his motion. Instead of so doing, the court invited the attorneys to go with him into his chambers. They did so, leaving the jury in the box. While the court and counsel were thus absent, one Henry McGinnis, who had testified as a witness in the case, stood in front of the jury and in the presence of the tearful widow of deceased, said to them: "Don't be hard on the poor widow, boys; give her a good round sum;" and other words of like effect. Thereupon some of the jurors ordered him away and he left the room. Shortly after, the court and counsel re-entered and the trial continued to its close. This matter was not called to the attention of counsel for appellant until after the jury had retired. It does not appear that counsel for appellee or the court knew of this occurrence until the motion for a new trial was made. The proposition that it was error for the court to retire to his chambers with counsel, and there hear the argument for and against this motion can not be sustained. Nor in fact was the jury left without being in charge of an officer of the court. Greenwald, one of the jurors, states that while he did not notice anybody in special charge of the jury, he did see the bailiff, who subsequently took charge of them, in the extreme east end of the room, busily engaged in writing. The jury were in their box, and the bailiff was there in charge of the entire court room, and this included the jury. Appellant was not unrepresented in the court room during the absence of the judge and the counsel. George L. Campbell, a special agent of appellant, a part of whose duties was the preparation for trial of cases brought against it, who had twice before prepared this case for trial, and who was engaged in the same duty upon this trial, sat in the court room and saw McGinnis go up and stand before the jury and talk to them but did not hear what he said. Campbell says that McGinnis "created a great deal of amusement on the stand as a witness, and deponent thought at this time that pos-

Chicago Junction Ry. Co. v. McGrath.

sibly McGinnis was joking with said jurors about something which had nothing to do with the case. When the judge and counsel returned to the court room, Campbell suffered the case to proceed to a close, and the jury to retire before he told counsel for appellant, or any one else, what had happened. He says that "subsequent to this time" he first learned that McGinnis had been making a speech to the jury on behalf of the widow; but he also says that while McGinnis spoke to the jury he "had the attention of all said jurors, and that they appeared to be eagerly listening to what he was saying." Campbell, upon the happening of so suspicious a circumstance, should have at once told it to the judge when he and the counsel returned to the court room, in order that the facts might be ascertained, and the jury discharged from further service, if it appeared that they had been improperly influenced by what had occurred. Instead of so doing, he kept silent, so far as the court was concerned, until the jury had returned a verdict against his principal, and thereby put himself under the possible presumption that he kept back this information for an unworthy purpose. It is proper to notice that the several affidavits of three of the jurors were presented on the motion for a new trial, and in no one of them is there the slightest hint that the jury considered what McGinnis said as worthy of any consideration. One of the jurors describes McGinnis as "an odd, funny old Irishman," and the other two interrupted the speech and ordered the orator to go away.

As might be expected, the authorities conflict upon what is the right conduct of the court in cases where it is charged that the jury was subject to extraneous influences. It must necessarily be so, for each case, to be correctly determined, must stand upon its own facts. We all agree upon the basic principle that the purity of jury trials must be preserved. In Madden v. State, 1 Kan. 351, the jury were allowed to separate, the bailiff in charge absented himself, outside parties talked privately to some of the jurors after they had retired, and the bailiff told interested parties just how the jury stood during their deliberations.

In Woods v. State, 43 Miss. 364, a capital case, the jury were allowed to separate. The court held that to be sufficient to call for a new trial, for in such a case the jury should not be exposed to the possibility of undue influence.

In Tomlin v. Cox, 19 N. J. L. 76, the court set aside the verdict because the prevailing party had privately conversed with one or more of the jurors during the trial.

In Brown v. Pippin, 68 Tenn. 657, the court, from the evidence presented, was convinced that one of the interested and prevailing parties was tampering with one of the jurors, and that the juror was encouraging him.

In McDaniels v. McDaniels, 40 Vt. 363, it appeared that there was a systematic talking at and in the presence of the jury by many persons during the progress of the trial, for the purpose of influencing the verdict.

In each of these cases, and in many others to which we have been referred, a new trial was granted, and we think properly so.

But it is not every interference with the jury that will call for the setting aside of the verdict, and thus deprive the prevailing party of the benefit of the trial. This entire matter was presented to and investigated by the learned trial judge, and he found that the incident was unimportant and did not affect the verdict. The granting or the refusing of a new trial is in the legal discretion of the presiding judge. It is unnecessary to cite authorities to the effect that when he has exercised that discretion, we can not interfere with his action unless, from the facts and circumstances appearing in evidence, we are of the opinion he was clearly wrong. We are not so convinced.

The judgment of the Superior Court is affirmed.